# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                            CR No. 16-3076 JCH

OSCAR MORENO CORONADO,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Oscar Moreno Coronado's Motion to Suppress for Evidence Obtained as a result of Violations of Amendment IV to the United States Constitution (ECF No. 62). The Court held a hearing on the motion on August 1, 2017. The Court, having considered the motion, briefs, evidence, argument, and otherwise being fully advised, concludes that the motion to suppress should be denied.

    **I.**     **FACTUAL FINDINGS**

Special Agent William Baker has worked for the Drug Enforcement Administration ("DEA") since 2004. He has been involved in approximately 20 methamphetamine ("meth") investigations using undercover agents and surveillance techniques. Special Agent Baker contacted a paid confidential informant ("CI"), whose services the DEA used in other investigations in Miami and Houston. The CI knew Joshua Talamantes from a previous incarceration. Agents knew that Mr. Talamantes lived in Haskell, Texas and had a lengthy criminal history.

Special Agent Baker put the CI in touch with an undercover officer ("UC") with New Mexico State Police ("NMSP"). The UC and CI made arrangements for the CI to contact Mr. Talamantes. The CI called Mr. Talamantes and said he had a guy in Albuquerque that wanted to purchase meth and they exchanged numbers. The UC then began communicating with Mr. Talamantes directly via cell phone and for over a month tried to arrange the deal with Mr. Talamantes. The DEA paid the CI for his efforts.

The UC finally set up a deal to buy four pounds of meth on June 28, 2016. Mr. Talamantes agreed to meet the UC agents in the Lowe's parking lot near Interstate-40 ("I-40") and 12th Street in Albuquerque. Early in the day on June 28, 2016, Mr. Talamantes communicated with the UC that he was heading that way and would be there in a few hours. The agents knew Mr. Talamantes' identity and what he looked like from his driver's license and prior arrest photographs. Special Agent Baker arranged surveillance of Mr. Talamantes at the meeting location in Albuquerque using agents from the DEA, Department of Homeland Security ("HSI"), and NMSP. Agents set up a perimeter and were stationed at the Lowe's hardware store and at the nearby Walgreens and Four Winds gas station. Special Agent Baker was in a vehicle with the two UC officers and another agent.

Special Agent Baker's boss first identified Mr. Talamantes by his photographs when Mr. Talamantes pulled into the Four Winds gas station and parked next to him. Mr. Talamantes drove a black Ford Fusion with Texas plates. A female was in the car with him. Agents kept Mr. Talamantes under continual surveillance from that point until his arrest using ground and aerial units.

At approximately 2:45 p.m., Mr. Talamantes called the UC to let him know that he was waiting on his "boy" to come. Initially, agents thought that Mr. Talamantes was bringing the

meth with him from Texas, but his communications with the UC about his boy bringing it led them to believe Mr. Talamantes was waiting for the drugs to be delivered to him. Agents believed that his "boy" referred to someone who would supply Talamantes with drugs.

Around 4:50 p.m., Mr. Talamantes drove to a Lowe's grocery store where agents followed him. Mr. Talamantes sat there for a couple minutes, and then he drove right back to the Four Winds gas station. He did not meet anyone at the Lowe's grocery store. Mr. Talamantes texted the UC again and said he was still waiting on his guy.

About 5:24 p.m., Mr. Talamantes pulled out of the parking lot and drove eastbound on I-40. While he was driving on I-40, Mr. Talamantes called the UC and said he had just met with his boy over at Eubank and gotten the meth and would meet back at the Four Winds gas station. Despite his statement, agents did not believe Mr. Talamantes had the meth yet, because he had waited nearly three hours to meet his contact and was driving towards, but had not yet reached, Eubank Boulevard. Mr. Talamantes exited at Eubank and drove to Hotel Circle where he parked in the back of the Amberly Suites Hotel. After less than a minute, a Mustang with Texas license plates pulled up to the Ford Fusion, and Mr. Talamantes had a short conversation with the other driver. Mr. Talamantes followed the other vehicle north on Eubank to a small strip center where they parked trunk-to-trunk behind one another. Special Agent Baker drove by the vehicles and observed Mr. Talamantes and the driver of the Mustang, later identified as Defendant Moreno Coronado, meeting. The meeting took place around 5:53 p.m.

HSI Agent Chris Martin drove by in another surveillance truck, and he saw Mr. Talamantes reach into the trunk of the Mustang, retrieve a bag from the trunk, and put it into his Fusion. The meeting lasted about three minutes. Mr. Talamantes and Defendant then got in their separate vehicles and began driving away. Shortly thereafter, Mr. Talamantes called the UC to

say he had the stuff and to meet back at the Four Winds gas station. Based on his training and experience, Special Agent Baker believed that Defendant was the source of supply delivering methamphetamine to Mr. Talamantes. Special Agent Baker followed Mr. Talamantes in the Fusion back to I-40 and the gas station.

Meanwhile, Agent Chris Martin followed Defendant Moreno Coronado. Other DEA agents provided air surveillance of Defendant. In addition, agents had already prearranged an NMSP marked unit to conduct traffic stops as needed for the operation. While following Mr. Talamantes on I-40, Special Agent Baker instructed Agent Israel Rodriguez, who was a passenger in his vehicle, to call NMSP Sergeant Arsenio Chavez and tell him to arrest the driver of the Mustang for being the source of supply for the meth they suspected Mr. Talamantes was delivering to the UC.

Following the incident, Special Agent Baker spoke with Agent Martin and Sergeant Chavez. Based on those conversations, Special Agent Baker learned the following: Defendant, immediately after meeting with Mr. Talamantes, traveled north on Eubank Boulevard a couple blocks to another traffic light where he made a U-turn. Defendant then drove southbound on Eubank to westbound I-40. He proceeded to southbound Interstate 25 ("I-25"). At that time, Defendant started driving very fast, reaching speeds up to 100 miles per hour. Agent Martin had difficulty keeping constant visual surveillance on Defendant because he drove at high speeds, weaving in and out of heavy traffic. Defendant exited I-25 at the Isleta exit. Although Agent Martin and Sergeant Chavez were trying to catch up to him to do a traffic stop, they did not reach him until he was parked at the Isleta Casino and already out of his car. When Sergeant Chavez caught up to Defendant, he was walking towards the hotel. At that time, Sergeant Chavez arrested Defendant. Sergeant Chavez did not give Defendant his *Miranda* warnings at the scene,

nor did he interview him. The basis for the arrest was Special Agent Baker's belief that Defendant was the source of supply of methamphetamine. The subjective purpose of the arrest was not because of the manner in which Defendant was driving.

Meanwhile, Mr. Talamantes arrived back at the Four Winds gas station. The UC agents drove to the Four Winds, parked, and texted they were there. Mr. Talamantes then got out of his Ford Fusion, brought the bag with him, and gave it to the UC. When the UC opened the bag, it contained approximately four pounds of methamphetamine. Agents arrested Mr. Talamantes and field-tested the substance. Agent Martin subsequently identified the bag as the same one that Mr. Talamantes removed from the trunk of Defendant's Mustang.[1]

Several hours later, after agents transported Defendant to the DEA offices, Special Agent Baker advised Defendant of his *Miranda* rights. Defendant waived his rights and agreed to talk. Defendant moves to suppress the statements he made in the interview, arguing agents did not have probable cause to believe he was involved in a crime to support his warrantless arrest, in violation of the Fourth Amendment.

**II.     ANALYSIS**

A warrantless arrest does not violate the Fourth Amendment so long as an officer has probable cause to believe that the arrestee committed a crime. *Rife v. Oklahoma Department of Public Safety*, 854 F.3d 637, 645 (10th Cir. 2017). Probable cause to arrest exists only when the facts and circumstances known to the officer are sufficient to warrant a man of reasonable caution to believe that a criminal offense has been or is being committed. *Id.*; *United States v. Cruz-Mendez*, 467 F.3d 1260, 1268 (10th Cir. 2006) (quoting *United States v. Soto*, 375 F.3d

---

[1] Information gleaned after an arrest is not relevant to the probable cause inquiry. *See A.M. v. Holmes*, 830 F.3d 1123, 1130 (10th Cir. 2016). The Court includes the information in this paragraph for context, but does not rely on this evidence in analyzing whether there was probable cause to arrest Defendant, because the evidence indicates agents received the bag of meth from Mr. Talamantes after Sergeant Chavez had already arrested Defendant.

1219, 1222 (10th Cir. 2004)). The probable cause determination is based on an objective standard looking at the totality of the circumstances. *Id.* A court looks at whether, given all the circumstances, there is a probability or substantial chance of criminal activity based on commonsense considerations. *United States v. Pulliam*, 748 F.3d 967, 971 (10th Cir. 2014). Although probable cause does not require certainty or proof beyond a reasonable doubt, it requires more than a mere suspicion of unlawful activity. *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010). Moreover, an arresting officer is entitled to rely on information or instructions relayed to him by other officers in making a seizure, even if the officer is not privy to all the facts amounting to probable cause. *See United States v. Hinson*, 585 F.3d 1328, 1334 (10th Cir. 2009); *Koch v. City of Del City*, 660 F.3d 1228, 1240 (10th Cir. 2011).

### A. Probable cause that Defendant was involved in drug trafficking

At the time Sergeant Chavez arrested Defendant Moreno Coronado, agents knew the following: (i) the UC had arranged to buy four pounds of meth from Mr. Talamantes in Albuquerque on June 28, 2016; (ii) Mr. Talamantes lived in Texas; (iii) Mr. Talamantes drove to Albuquerque and arrived at the pre-arranged meeting location for the drug transaction at 2:45 p.m.; (iv) despite being at the pre-arranged location, Mr. Talamantes told the UC he was waiting for his boy and put off their meeting for approximately three hours; (v) agents observed Mr. Talamantes waiting at the gas station for most of that nearly three-hour period; (vi) around 5:24 p.m., Mr. Talamantes drove eastbound on I-40, and while driving on I-40, he called the UC to say he had just met with his boy over at Eubank and gotten the meth and would meet back at the Four Winds gas station; (vii) Mr. Talamantes shortly thereafter exited at Eubank and met a Mustang with Texas license plates; (viii) Mr. Talamantes followed the other vehicle north on Eubank to a small strip center where they parked trunk-to-trunk behind one another; (ix) during

the three-minute meeting, Mr. Talamantes retrieved a bag from the trunk of Defendant's Mustang and put it in his own car; (x) immediately thereafter, Mr. Talamantes drove back towards the Four Winds gas station and called the UC to say he had the stuff and to meet back at the Four Winds gas station.

In light of the totality of these facts, the Court concludes the agents had probable cause to believe that Defendant Moreno Coronado had committed the crime of drug trafficking. The Court recognizes that it would be a simpler case if agents had waited to arrest Defendant until after they confirmed drugs were in the bag Mr. Talamantes possessed. Nevertheless, this case is not one that involved a random bag transfer. Rather, UC agents had made specific arrangements to purchase meth from Mr. Talamantes in Albuquerque on that specific date and location. Mr. Talamantes, a Texas resident, waited in a parking lot for nearly three hours and, aside from the female with him, met only with Defendant, who drove a vehicle with Texas plates. Mr. Talamantes retrieved a bag from Defendant's trunk, and then shortly thereafter called the UC officer to inform him he had the drugs and would meet him at the gas station, the same pre-arranged meeting place to conduct the drug sale. Common sense and the known facts were sufficient to warrant a man of reasonable caution to believe that Defendant Moreno Coronado was involved in the criminal offense of drug trafficking and had supplied the meth to Mr. Talamantes. Officers need not rule out all innocent explanations for a suspect's behavior. *Rife*, 854 F.3d at 644-45 (and citing cases). The evidence known to agents here meets the probable cause standard of "probability or substantial chance of criminal activity." *United States v. Biglow*, 562 F.3d 1272, 1281 (10th Cir. 2009). Defendant's arrest therefore did not violate the Fourth Amendment.

### B. Probable cause that Defendant committed reckless driving

Alternatively, Defendant's arrest was lawful because officers had facts to support an

arrest based on reckless driving. "[A]n arresting officer's 'subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause.'" *Rife*, 854 F.3d at 646 (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). "Those are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest." *Devenpeck*, 543 U.S. at 155 (holding that officer's subjective intent is irrelevant and rejecting rule that offense establishing probable cause must be closely related to offense identified by arresting officer at time of arrest). *See also United States v. Lopez*, 849 F.3d 921, 928 (10th Cir. 2017) ("[I]f there was probable cause to arrest for a crime, it does not matter whether the officer subjectively detained the person for that crime."). Moreover, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001).

In New Mexico, reckless driving is a petty misdemeanor offense, in which on a first offense, a convicted offender may receive a fine or "imprisonment for not less than five days nor more than ninety days," or both. N.M. Stat. Ann. § 66-8-113(B). A person commits reckless driving if he "drives any vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property." *Id.* § 66-8-113(A). Speeding alone is insufficient to constitute reckless driving, but recklessness may be proven if the speeding created a danger to others and additional conduct shows the driver willfully disregarded the safety of others. *State v. Munoz*, 2014-NMCA-101, ¶ 10, 336 P.3d 424.

Although agents arrested Defendant for drug trafficking, not for reckless driving, an arrest is lawful if the facts provide probable cause to arrest a suspect on some ground. "[H]earsay

testimony is admissible at suppression hearings such as the present one and should be considered by a district court in deciding whether an arrest was based on probable cause." *United States v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004). Agent Martin and Sergeant Chavez did not testify, but Special Agent Baker testified to what they communicated to him and his testimony was credible. According to those communications, Agent Martin and Sergeant Chavez observed Defendant driving in excess of 100 mph, weaving in and out of heavy traffic. These facts provide a basis for a reasonable officer to believe that Defendant created a danger to other drivers on I-25 and willfully disregarded their safety. Defendant's arrest was thus lawful on the additional ground that there existed probable cause to arrest Defendant for reckless driving.

**IT IS THEREFORE ORDERED** that Defendant Oscar Moreno Coronado's Motion to Suppress for Evidence Obtained as a result of Violations of Amendment IV to the United States Constitution (**ECF No. 62**) is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**