# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                                                                        CR No. 16-3076 JCH

OSCAR MORENO-CORONADO,

    Defendant.

## AMENDED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on Defendant's Motion for Production of Alleged Co-Conspirator Statements, Pre-trial Hearing on their Admissibility pursuant to Fed. R. Evid. 801(d)(2)(E) (ECF No. 109) and Defendant's Motion in Limine #1 to Exclude Hearsay (ECF No. 110). Defendant seeks to exclude communications between law enforcement and Joshua Talamantes through text messages and telephone conversations, asserting the statements are inadmissible hearsay and do not fall within the co-conspirator statement exception. Defendant further contends their introduction would violate his Sixth Amendment right to confront witnesses under *Crawford v. Washington*, 541 U.S. 36 (2004). The Government disclosed a number of conversations between Talamantes and the undercover agent that it intends to offer at trial and argues they are not hearsay under Rule 801(d)(2)(E) and/or they contain statements which fall under other exceptions to the hearsay rule. The Court held a hearing on the motions on January 10,

---

[1] The Court in its previous Memorandum Opinion and Order failed to address the non-coconspirator statements contained in the text conversation between the undercover agent and Joshua Talamantes between 6:06 p.m. and 6:13 p.m. This amended Memorandum Opinion and Order includes section III(E)(5) to address the omission. In all other respects this Memorandum Opinion and Order is unchanged.

2019. The Court, having considered the motions, briefs, evidence, applicable law, and otherwise being fully advised, makes the following provisional findings of fact and conclusions of law. The Court additionally makes provisional rulings on admissibility that are subject to the foundation set forth by the Government in the hearing and in the briefs being properly laid at trial with admissible evidence. The coconspirator statements that the Court provisionally rules admissible herein should not be presented to the jury until the Court makes a final ruling on admissibility at trial.

## I. LEGAL STANDARD

Hearsay is a statement that "the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(1)-(2). "But testimony not offered to prove the matter asserted that is 'offered instead for *relevant* context or background' is not hearsay." *United States v. Becknell*, 601 F. App'x 709, 712 (10th Cir. 2015) (unpublished opinion) (quoting *United States v. Hinson*, 585 F.3d 1328, 1336 (10th Cir.2009)). Questions and comments do not constitute hearsay if they are not offered to prove the truth of the matter but are offered to show their effect on the other person in the conversation and provide context. *See United States v. Smalls*, 605 F.3d 765, 785 n. 18 (10th Cir. 2010).

Although hearsay statements are generally not admissible at trial, *see* Fed. R. Evid. 802, a statement that "was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay, and therefore may be admissible as substantive evidence against the party, Fed. R. Evid. 801(d)(2)(E). For a statement to be non-hearsay under Rule 801(d)(2)(E), the district court must first find the following elements by a preponderance of the evidence: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made during the course of and in furtherance of the conspiracy. *United States v. Rutland*, 705

F.3d 1238, 1248 (10th Cir. 2013). The elements of conspiracy, in turn, are: (1) there was an agreement to violate the law; (2) the declarant knew the essential objective of the conspiracy; (3) the declarant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent. *Id.* at 1249 (citing *United States v. Ailsworth*, 138 F.3d 843, 850-51 (10th Cir. 1998)). The government, as the proponent of the evidence, has the burden of proving the relevant preliminary facts. *United States v. Perez*, 989 F.2d 1574, 1580 (10th Cir. 1993).

The government does not have to prove an express or formal agreement was made; rather, it merely has to show the coconspirators tacitly came to a mutual understanding. *Rutland*, 705 F.3d at 1250. "The existence of a conspiracy may be inferred from circumstantial evidence." *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987). Interdependence means the coconspirators were united in a common goal or purpose. *Ailsworth*, 138 F.3d at 851. The trial witness need not be a co-conspirator, so long as the declarant is a co-conspirator with the defendant against whom the statement is being offered. *See United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995) ("in deciding whether statements are admissible under Rule 801(d)(2)(E), the appropriate focus is on whether the statements were 'made by' a member of the conspiracy, and not on whether the statements were 'made to' a member of the conspiracy"). One cannot conspire solely with government informants or agents. *United States v. Wells*, 739 F.3d 511, 528 (10th Cir. 2014).

When making a determination under Rule 801(d)(2)(E), the court "may consider both independent evidence and the statements themselves." *Rutland*, 705 F.3d at 1248. To satisfy Rule 801(d)(2)(E), the United States need show only that there is "some independent evidence linking the defendant to the conspiracy." *Martinez*, 825 F.2d at 1453 (relying on *Bourjaily v. United States*, 483 U.S. 171 (1987)). "[S]uch independent evidence may be sufficient even it is not 'substantial.'"

*United States v. Owens*, 70 F.3d 1118, 1125 (10th Cir. 1995) (quoting *United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993)). Independent evidence is any "evidence other than the proffered [coconspirator] statements themselves," and may include "an out-of-court statement by a coconspirator to a government agent during an investigation." *Owens*, 70 F.3d at 1125 (quoting *Martinez*, 825 F.2d at 1451).

With regard to the third element under Rule 801(d)(2)(E), "in furtherance" means that the statements are "intended to promote the conspiratorial objectives." *Rutland*, 705 F.3d at 1252 (quoting *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007)). Examples of statements the Tenth Circuit has held to be in furtherance of a conspiracy include

> statements explaining events of importance to the conspiracy, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, statements identifying a fellow coconspirator, and discussions of future intent that set transactions to the conspiracy in motion or that maintain the flow of information among conspiracy members.

*Id.* (internal quotations and citations omitted). Additionally, statements identifying members of a conspiracy, discussing particular roles of other coconspirators, and avoiding detection by law enforcement personnel are made "in furtherance of" a conspiracy. *Williamson*, 53 F.3d at 1520. "A coconspirator statement is made during the course of the conspiracy it if is made before the objectives of the conspiracy have either failed or been achieved." *Owens*, 70 F.3d at 1126 (quoting *Perez*, 989 F.2d at 1579). "[P]revious statements made by co-conspirators are admissible against a defendant who subsequently joins the conspiracy." *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991).

Rule 801(d)(2)(E) requires the trial court to make findings on the record regarding the required elements before admitting coconspirator's out of court statements. *See Perez*, 989 F.2d at 1581. The "strongly preferred order of proof" in determining the admissibility of an alleged

coconspirator's statement is to first hold a hearing outside the presence of the jury to determine whether the party offering the statements has established the existence of a conspiracy by a preponderance of the evidence. *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994). At the hearing, the district court has discretion to consider "any evidence not subject to a privilege, including both the coconspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial." *Owens*, 70 F.3d at 1124.

It is, however, permissible for a court provisionally to allow in the evidence with the understanding that the offering party will present evidence during the course of trial that will prove the existence of the predicate conspiracy. *Rutland*, 705 F.3d at 1248 n.3 (explaining that it was permissible for trial court to admit coconspirator statements provisionally, conditioning admission on government's promise to develop proof of conspiracy through later testimony, but noting Tenth Circuit has repeatedly mentioned its strong preference for *James* proceedings); *Owens*, 70 F.3d at 1123 (explaining that district court may make findings under Rule 801(d)(2)(E) either by holding *James* hearing outside presence of jury or may provisionally admit evidence with caveat that evidence must "connect" up during trial).

Moreover, an undercover agent's portions of a conversation containing co-conspirator statements may be admissible as reasonably required to place the coconspirator statements into context. *See United States v. Hendricks*, 395 F.3d 173, 718-19 (3d Cir. 2005) ("We thus hold that if a Defendant or his or her coconspirator makes statements as part of a reciprocal and integrated conversation with a government informant who later becomes unavailable for trial, the Confrontation Clause does not bar the introduction of the informant's portions of the conversation as are reasonably required to place the defendant or coconspirator's nontestimonial statements into

context.").

## II. FINDINGS OF FACT

In making these findings, the Court has considered the content of the alleged co-conspirator statements themselves, as well as a substantial amount of independent evidence of the existence of the conspiracy that was introduced by the United States during the hearing. The Court considered the testimony of Special Agent William Baker at both the *James* hearing and the hearing held on Defendant's motion to suppress on August 1, 2017. Agent Baker testified credibly concerning the undercover officer's ("UC") communications with Joshua Talamantes to arrange a purchase of methamphetamine ("meth"); how the UC set up a deal to buy four pounds of meth on June 28, 2016; the UC's communications with Talamantes on June 28, 2016 to arrange meeting with Talamantes to purchase the meth; the surveillance by agents from the Drug Enforcement Administration ("DEA"), Department of Homeland Security ("HSI"), and New Mexico State Police ("NMSP"); the observations of agents of Talamantes's meeting with Defendant; the subsequent meth exchange by the UC with Talamantes; and the arrests of Talamantes and Defendant.

After the suppression hearing, the Court entered a Memorandum Opinion and Order concluding that, at the time Sergeant Chavez arrested Defendant Moreno-Coronado, there was probable cause to believe he had committed the crime of drug trafficking. *See* Mem. Op. and Order 1, 6-7, ECF No. 78. In support of that conclusion, the Court made the following factual findings:

> (i) the UC [an undercover officer with New Mexico State Police] had arranged to buy four pounds of meth from Mr. Talamantes in Albuquerque on June 28, 2016; (ii) Mr. Talamantes lived in Texas; (iii) Mr. Talamantes drove to Albuquerque and arrived at the pre-arranged meeting location for the drug transaction at 2:45 p.m.; (iv) despite being at the pre-arranged location, Mr. Talamantes told the UC he was waiting for his boy and put off their meeting for approximately three hours; (v) agents observed Mr. Talamantes waiting at the gas station for most of that nearly three-hour period; (vi) around 5:24 p.m., Mr. Talamantes drove eastbound on I-40,

6

and while driving on I-40, he called the UC to say he had just met with his boy over at Eubank and gotten the meth and would meet back at the Four Winds gas station; (vii) Mr. Talamantes shortly thereafter exited at Eubank and met a Mustang with Texas license plates; (viii) Mr. Talamantes followed the other vehicle north on Eubank to a small strip center where they parked trunk-to-trunk behind one another; (ix) during the three-minute meeting, Mr. Talamantes retrieved a bag from the trunk of Defendant's Mustang and put it in his own car; (x) immediately thereafter, Mr. Talamantes drove back towards the Four Winds gas station and called the UC to say he had the stuff and to meet back at the Four Winds gas station.

*Id.* at 6-7. The Court made further findings:

> Meanwhile, Mr. Talamantes arrived back at the Four Winds gas station. The UC agents drove to the Four Winds, parked, and texted they were there. Mr. Talamantes then got out of his Ford Fusion, brought the bag with him, and gave it to the UC. When the UC opened the bag, it contained approximately four pounds of methamphetamine. Agents arrested Mr. Talamantes and field-tested the substance. Agent Martin subsequently identified the bag as the same one that Mr. Talamantes removed from the trunk of Defendant's Mustang.

*Id.* at 5.

Agent Baker confirmed at the *James* hearing that his testimony in the suppression hearing, as contained in the Court's transcript of the proceedings was true and correct. Agent Baker additionally testified at the *James* hearing that Agent Chris Martin said he saw Talamantes reach into the trunk of Defendant Moreno-Coronado's vehicle and retrieve a black and yellow Dewalt tool bag that he put in his own vehicle; later, Chris Martin confirmed that this same Dewalt tool bag contained the meth confiscated from Talamantes.

The Court finds the following facts by a preponderance of the evidence:

### A.   Statements described in Gov.'s Resp., Ex. A at 4 (Report of NMSP Agent Israel J. Rodriguez), ECF No. 121-1 at 5 of 6

The UC and Talamantes had a conversation prior to June 28, 2016 in which Talamantes agreed to sell the UC four pounds of meth. *See* Motion to Suppress Hr'g Tr. 6:10-7:2. **Talamantes spoke to the UC the morning of June 28, 2016 to say he was on his way up, and Talamantes agreed to meet the UC in the Lowe's hardware store parking lot located at 12th Street,**

7

**Albuquerque, New Mexico, to sell the drugs**. *See id.* 7:12-8:5.

The Report submitted by the Government as Exhibit A to its response indicates that "[p]revious arrangements were made, and agreed to by Joshua Talamantes to sell me a large quantity of narcotics." The timeframe of those previous discussions is unclear. It can be inferred from the circumstantial evidence that Defendant Moreno-Coronado conspired to distribute meth with Talamantes on June 28, 2016, when Talamantes began driving from El Paso, but at this stage, the Government has not met its burden to show Defendant conspired with Talamantes prior to that date. *See Perez*, 989 F.2d at 1579 ("a court must carefully ascertain the nature and extent of a conspiracy in determining whether acts or statements can properly be viewed as made during its existence").

Talamantes's bolded statements above that he was on his way up and that he agreed to meet with the UC were statements he made for the purpose of arranging and meeting the UC to sell meth to the UC. The Court finds the bolded statements Talamantes made to the UC on June 28, 2016, regarding meeting at Lowe's were made in furtherance of the conspiracy and that Defendant and Talamantes had entered a conspiracy by that time.

### B. Hearing Exhibit B (Transcript of recorded call on June 28, 2016 at 2:45 p.m.)

Below are the contents of a call between the UC and Talamantes that occurred on June 28, 2016 at approximately 2:45 p.m.

UC: Hello.

TALAMANTES: ¿Qué dice, Izzy? (What's up, Izzy?)

UC: Eh, nada. Is this Tomal? (Oh, nothing. Is this Tomal?)

TALAMANTES: **Yeah, this is Tamal.**

UC: Hey, man. What's goin' on, brother?

8

TALAMANTES: **Este (uh), I'm just waiting about twenty more minutes, 'bout twenty, thirty more minutes and my uh, my, my boy will be here.**

UC: All right, cool. Uh…did Wes tell you where to meet me?

TALAMANTES: **Yeah, but uh, I'm gonna tell you somethin'. There's a, there's someone there. So uh…**

UC: Okay.

TALAMANTES: …**I'm posted up at the, at the little gas station next door.**

UC: The little gas station where?

TALAMANTES: **The, the liquor store next door, next to it.**

UC: Oh, okay, all right.

TALAMANTES: All right. And uh, but right now when I call you, I mean, **how long is it gonna take you to get here?**

UC: Once, once you call me it should take me like five, ten minutes maybe, at the most.

TALAMANTES: **All right, then you're good. I'll give you a call right now when he's here.**

UC: All right, cool.

TALAMANTES: All right then, brother.

UC: Bueno. (All right)

TALAMANTES: All right.

UC: All right, later.

-End of phone call-

Gov.'s Hr'g Ex. B (bolded emphasis added).

The statements by Talamantes in bold above were statements he made for the purpose of

arranging and meeting to sell meth to the UC. The purpose of the statements served to identify himself to the buyer ("this is Tamal"), update the buyer of the timeframe to meet ("I'm just waiting about twenty more minutes, 'bout twenty, thirty more minutes"; "All right, then you're good. I'll give you a call right now when he's here."), identify another member of the conspiracy ("and my uh, my, my boy will be here"; "I'll give you a call right now when he's here."), describe an act of concealment ("Yeah, but uh, I'm gonna tell you somethin'. There's a there's someone there. So uh…"), describe the new and more discrete location for the meet ("I'm posted up at the, at the little gas station next door…The, the liquor store next door, next to it"), and coordinate the timing for the meet ("And uh, but right now when I call you, I mean, how long is it gonna take you to get here? … All right, then you're good. I'll give you a call right now when he's here."). The Court finds these bolded statements were made in furtherance of the conspiracy to distribute meth.

### C. Hearing Exhibit A (**Text exchange between UC and Talamantes between 4 and 5 p.m. on June 28, 2016**)

Below are the contents of a call between the UC and Talamantes that occurred on June 28, 2016 between approximately 4:00 p.m. and 5:00 p.m.

UC: Hey bro it's Izzy what's up [4:03 p.m.]

TALAMANTES: **I'm still here waiting on him he should b here just doing some things if u know what I mean** [4:04 p.m.]

TALAMANTES: **I'm close to where primo said** [4:04 p.m.]

TALAMANTES: **Let me call him again** [4:04 p.m.]

UC: Ok kool let me know [4:05 p.m.]

TALAMANTES: **I will trust me I'm in a hurry to leave back .. Got shit to do too.. But let's get this done.., and I'm in a black fusion** [4:06 p.m.]

UC: For sure bro let me know [4:06 p.m.]

10

> TALAMANTES: **Yeah he just texted me** .. He's here just at a garage party? [4:08 p.m.]
>
> UC: Ok let me know [4:09 p.m.]
>
> TALAMANTES: Coo [4:09 p.m.]
>
> TALAMANTES: Yo [4:57 p.m.]
>
> TALAMANTES: **I'm gonna meet my guy somewhere ok n I'll see u where we said ..** [4:57 p.m.]
>
> UC: What's up homie [4:57 p.m.]
>
> TALAMANTES: **He's funny about shit** [4:57 p.m.]
>
> TALAMANTES: **But I got u** [4:57 p.m.]
>
> TALAMANTES: I'm gps inch this damm thing [4:58 p.m.]
>
> UC: Ok [4:58 p.m.]
>
> UC: Ok kool bro [4:58 p.m.]

Gov.'s Hr'g Ex. A (bolded emphasis added).

The statements by Talamantes in bold above were statements he made for the purpose of arranging and meeting to sell meth to the UC. The purpose of the statements served to update the potential bury of the expected time frame to meet ("I'm still here waiting on him he should b here just doing some things if u know what I mean"); confirms he is relying on and waiting for another member of the conspiracy ("I'm still here waiting on him"; "Let me call him again"; "Yeah he just texted me."; "I'm gonna meet my guy somewhere ok n I'll see u where we said"; "He's funny about shit."), identifies his location ("I'm close to where primo said"); identifies his vehicle to facilitate the meeting ("I'm in a black fusion"), and confirms Talamantes's intent to move forward with the meeting soon ("I will trust me I'm in a hurry to leave back .. Got shit to do too.. But let's get this done."; "But I got u"). The Court finds these bolded statements were made in furtherance of the

11

conspiracy.

### D. Hearing Exhibit C (Transcript of recorded call between Talamantes and UC at 5:37 p.m.)

Below are the contents of a call between the UC and Talamantes that occurred on June 28, 2016 at approximately 5:37 p.m.

UC: Hello.

TALAMANTES: Hey, what's up, man?

UC: Hey, man, how's…

-Problem with connection-

-Cough-

TALAMANTES: **All right, everythin' is good. I, I just had a meeting with someone over here by Eubank.** Do you know where Eubank is at?

UC: Uh, yeah. (UNINTELLIGIBLE)

TALAMANTES: Yeah, well, I'm on my way…back.

UC: Okay. You're on your, on, from Eubank on the way back?

TALAMANTES: Yeah. Well, I'm, I'm barely leavin' like the fuckin'…the lot.

UC: Oh, okay. So…

-Simultaneous conversation-

TALAMANTES: All right.

UC: …probably like…

TALAMANTES: **So give me about…**

UC: …twenty-five minutes…

TALAMANTES: …**give me about…**

UC: …or so? Cuz…

12

TALAMANTES: **Yeah, about twenty-five minutes…**

UC: …the traffic is bad.

TALAMANTES: …**I'll be there.**

UC: All right. Yeah…it's fuckin'…

TALAMANTES: Yeah. No, I fuckin' saw the traffic on the way over here. God Damn!

UC: I know, that's why I'm sayin'. When you go back that way, it's gonna be worse. So, that's why I say about twenty-five minutes you say?

TALAMANTES: **Yeah, twenty-five, thirty minutes. Thirty-five m, (stammers) b, uh, eh, meet me at the, at that uh, liquor store next door in 'bout thirty minutes.**

UC: The liquor store? Okay. The one that's like uh, it's right there by the Walgreens or somethin' like that?

TALAMANTES: **Yeah**.

UC: Okay. I will.

-Simultaneous conversation-

TALAMANTES: And uh…

UC: 'Bout thirty minutes or so.

TALAMANTES: …**I'm drivin' a, a black, I'm drivin' a black Ford Fusion.**

UC: All right, cool. All right, bueno (all right), I'll see you there, man.

TALAMANTES: A, all right then, bro.

UC: Bueno (all right), later.

TALAMANTES: All right.

-End of phone call-

Gov.'s Hr'g Ex. C (bolded emphasis added).

The statements by Talamantes in bold above were statements he made for the purpose of arranging and meeting to sell meth to the UC. The purpose of the statements served to update the buyer of his meeting with his supplier ("All right, everythin' is good. I, I just had a meeting with someone over here by Eubank."); confirm the meeting with the buyer and the timeframe for it ("So give me about…give me about…Yeah, about twenty-five minutes…I'll be there…Yeah, twenty-five, thirty minutes. Thirty-five m, (stammers) b, uh, eh, meet me at the, at that uh, liquor store next door in 'bout thirty minutes…. Yeah."); and identifies his own vehicle to facilitate meeting the buyer ("I'm drivin' a, a black, I'm drivin' a black Ford Fusion."). The Court finds these bolded statements were made in furtherance of the conspiracy.

### E. Hearing Exhibit A (Text conversation between Talamantes and UC from 6:06 pm and 6:13 p.m.)

Below are the contents of a text conversation between the UC and Talamantes that occurred on June 28, 2016 between approximately 6:06 p.m. and 6:13 p.m.

UC: give me a few bro stuck in traffic [6:06 p.m.]

TALAMANTES: **I'm at the liquor store** [6:06 p.m.]

UC: Ok [6:07 p.m.]

TALAMANTES: **Parked on the side** [6:08 p.m.]

UC: Ok [6:10 p.m.]

UC: Ok be there in about 5 mins traffic is bad [6:12 p.m.]

TALAMANTES: **Ok** [6:13 p.m.]

Gov.'s Hr'g Ex. A (bolded emphasis added).

The statements by Talamantes in bold above were statements he made for the purpose of arranging and meeting to sell meth to the UC. The purpose of the statements served to confirm his location for the drug sale. The bolded statements were made in furtherance of the conspiracy to

14

sell methamphetamine.

### III. CONCLUSIONS OF LAW

#### A. Existence of Predicate Conspiracy

Based on all of the evidence, the Court concludes that the Government has established by a preponderance of the evidence the existence of a conspiracy to distribute methamphetamine on June 28, 2016.

#### B. Talamantes and Defendant Moreno Were Members in the Conspiracy

Based on all of the evidence, the Court concludes that the Government has proven by a preponderance of the evidence that Talamantes and Defendant Moreno were members of a conspiracy to distribute methamphetamine on June 28, 2016.

#### C. Statements Were Made During and in Furtherance of Conspiracy

Based on all of the evidence, the Court finds by a preponderance of the evidence that the aforementioned bolded statements made by Talamantes, *see supra*, were made by Talamantes during and in furtherance of the conspiracy to distribute methamphetamine.

#### D. Admissibility of Co-Conspirator Statements

The Court concludes that the bolded coconspirator statements discussed *supra* are provisionally admissible against Defendant Moreno as non-hearsay under Rule 801(d)(2)(E).

#### E. Admissibility of Non Co-Conspirator Statements

##### 1. Gov.'s Resp., Ex. A at 4 (Report of NMSP Agent Israel J. Rodriguez), ECF No. 121-1 at 5 of 6

Alternatively, the Government argues the statement of location is not hearsay because it is not offered for the truth of the matter asserted, but it provides context for why agents established surveillance at that specific location. The Government also asserts it is a then-existing mental, emotional, or physical condition such as motive, intent, or plan under Rule 803(3). The Court is

not convinced of the admissibility under Rule 803(3).

The statement of location, however, is permissible background information necessary for the Government to explain why the agents were conducting the surveillance of the gas station on that date. *Cf. Becknell*, 601 F. App'x at 712 ("'One useful clue' in distinguishing hearsay from permissible background information is 'whether the purported background evidence is necessary for the government to be able to tell a coherent story about its investigation.'") (quoting *United States v. Hinson*, 585 F.3d 1328, 1336 (10th Cir. 2009)). The agent can testify to his efforts to contact Talamantes and arrange a drug deal in Albuquerque, but the Court will limit the provisional admission of statements of Talamantes under Rule 801(d)(2)(E) to those on June 28, 2016, because that is the day Talamantes drove to Albuquerque and met Defendant Moreno.

### 2. Hearing Exhibit B (Transcript of recorded call on June 28, 2016 at 2:45 p.m. )

The UC's portion of the conversation is admissible as not hearsay because his statements and questions are not offered for the truth of the matter but instead to provide context for the calls and statements and questions made by Talamantes. Talamantes's questions are not statements, and thus they are not hearsay and are admissible. Similarly, Talamantes's statement at the end of the conversation, "All right then, brother," and "All right" are not statements within the definition of hearsay and can be admitted. Consequently, the Court will provisionally admit the entire contents of the recorded call on June 28, 2016 at 2:45 p.m.

### 3. Hearing Exhibit A (Text exchange between UC and Talamantes between 4 and 5 p.m. on June 28, 2016)

As for the non-co-conspirator statements contained in the 4-5 p.m. text exchange, the Government agreed to redact as hearsay within hearsay the statement, "He's here just at a garage party?" Questions and statements like "Coo" and "Yo" and "Ok kool bro" are not hearsay within

the Rule 801 definition because they are not asserting anything but provide useful context and will be admitted.

As for the statement, "I'm gps inch this damm thing," the Government asserts this statement is admissible as a present sense impression under Rule 803(1). Rule 803(1) excludes as hearsay a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). The Government, however, did not present that agents observed Talamantes using his GPS at the time, so there is no evidence Talamantes was describing what he was doing. The Court will thus exclude the "gps" statement. Moreover, the statement's relevance and necessity for context are minimal, so the statement should be redacted.

### 4. Hearing Exhibit C (Transcript of recorded call between Talamantes and UC at 5:37 p.m.)

The questions Talamantes posed in the recorded call are not statements and therefore are not hearsay and admissible. As for the statements indicating Talamantes was on the way back from Eubank, the Government's position is that the statements were untrue, and thus not hearsay. The Court agrees. Talamantes's statement about the traffic is not offered for the truth and provides context for the conversation, so the Court will allow its admission. Statements like "A, all right then, bro" and "All right" are not hearsay within the Rule 801 definition because they are not asserting anything. Instead, they provide useful context and will be admitted. The statement by Talamantes telling the UC to meet him at the liquor store is an instruction, not offered for the truth, and thus admissible on that alternative ground. *Cf. Rutland*, 705 F.3d at 1253 (explaining that statements were instructions not offered for their truth and thus admissible regardless of which conspiracy they were made in furtherance of). Consequently, the Court will provisionally admit the entire contents of the recorded call on June 28, 2016 at 5:37 p.m.

### 5. Hearing Exhibit A (Text conversation between Talamantes and UC from 6:06 pm and 6:13 p.m.)

The UC's portion of the text conversation is admissible as not hearsay because his statements are not offered for the truth of the matter but instead to provide context for the calls and statements and questions made by Talamantes. Consequently, the Court will provisionally admit the entire contents of the text conversation from 6:06 p.m. through 6:13 p.m. on June 28, 2016.

**IT IS THEREFORE ORDERED** that

1. Defendant's Motion for Production of Alleged Co-Conspirator Statements, Pre-trial Hearing on their Admissibility pursuant to Fed. R. Evid. 801(d)(2)(E) (ECF No. 109) is **GRANTED in part and DENIED in part** as follows:

    a. Defendant's request for pretrial hearing was **GRANTED**.

    b. Defendant's request to exclude the co-conspirator statements described above is **DENIED**.

    c. Defendant's request to exclude non-co-conspirator statements is **GRANTED in part and DENIED** in part as described herein.

2. Defendant's Motion in Limine #1 to Exclude Hearsay (**ECF No. 110**) is **GRANTED in part and DENIED in part as described herein**.

_____
UNITED STATES DISTRICT JUDGE